UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SHAD DURHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04902-TWP-TAB |
| | ) | |
| FRESHREALM, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant FreshRealm, LLC ("FreshRealm") (Filing No. 22). Plaintiff Shad Durham ("Durham"), a forty-two year old White man, initiated this action following termination of his employment with FreshRealm. Durham asserts claims of reverse racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"), and age discrimination and retaliation in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") (Filing No. 1). For the following reasons, the Motion is **granted**.

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Durham as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

FreshRealm manages a "national supply of freshly prepared food products and ingredients" and assists "customers in the development of recipes, convenient delivery formats, and order management." (Filing No. 23-1 at 2.) Across the country, FreshRealm facilities manufacture and distribute prepared meal kits for major grocery stores (Filing No. 23-2 at 5). To ensure prompt

delivery of product to its Indiana customers FreshRealm opened a plant in Indianapolis, in 2017 (the "Indianapolis Plant").

FreshRealm hired Durham as an Assistant Plant Manager at the Indianapolis Plant sometime between July 2017 and August 2017 (Filing No. 23-1 at 3; Filing No. 23-2 at 5). Durham, a self-described "bigger guy" who sports a shaved head and multiple tattoos, is a White male, former Marine Corps veteran, in his early forties (Filing No. 23-2 at 4, 10, 42). When he was hired by FreshRealm, his starting salary was $80,000.00 per year (Filing No. 23-1 at 3).

In November 2018, Adam Williams ("Williams"), a Black man in his twenties (Filing No. 23-2 at 14), was hired at the Indianapolis Plant. While employed by FreshRealm, Williams received multiple promotions: from Supervisor to Manager to being made an Assistant Plant Manager on November 28, 2019. (Filing No. 23-1 at 3.) Each promotion was accompanied by a salary increase for Williams starting at $48,000.00 per year as a Supervisor, $55,000.00 per year as a Manager, and finally $65,000.00 per year as Assistant Plant Manager. *Id*. Durham and Williams both reported directly to the Plant Manager, Dallas Wait ("Wait").

In February 2019, Wait was promoted to "Director of Regional Operations – East." (Filing No. 23-3 at 2.) Wait's promotion resulted in both Durham and Williams taking on more responsibilities overseeing the Indianapolis Plant; however, they continued to report directly to Wait. (Filing No. 23-2 at 17.) While Durham and Williams held the same job title and essentially the same duties, Williams was called on more often to handle specific assignments and functions concerning the FreshRealm warehouse management system (known as "SAP"). *Id*. SAP computer software was integral to inventory allocation and product management at the Indianapolis Plant and other FreshRealm facilities. *Id*. At times, there were challenges for the workers in other sister sites and plants using SAP. *Id*. Williams was asked by FreshRealm to travel to other facilities to assist with SAP because of his extensive knowledge of the software and systems. *Id*.

2

Following Wait's promotion to Director of Regional Operations – East, FreshRealm "did not backfill" the Plant Manager position for the Indianapolis Plant and did not post the Plant Manager position as open ([Filing No. 23-3 at 3](#)).  Nonetheless, Durham sent a letter to Wait, Senior Vice President of Operations Neill King ("King"), and the Chief Executive Officer of FreshRealm, expressing interest in the Plant Manager position ([Filing No. 26-2 at 1](#)).  Durham also requested a development plan and guidance if his superiors decided he was not ready to assume the Plant Manager position.  *Id*.  Based on conversations with Wait, Durham believed he was being "groomed for the role." ([Filing No. 23-2 at 20](#).)  Although Durham was often referred to as the "acting Plant Manager" by the support staff, FreshRealm never designated him as such and never filled the role of Plant Manager at the Indianapolis Plant.  *Id*. at 11.

For the first 14 months of his employment, Durham received no discipline, whether formal or informal.  *Id.* at 9.  However, some members of FreshRealm's senior management and Human Resources Department ("HR") later "took issue" with what they deemed as Durham's "unprofessional communications and misconduct" on different occasions ([Filing No. 23-1 at 3](#)).

In February 2018, the Senior HR Manager Lisa Jackson ("Jackson") emailed Wait to inform him that "Durham had communicated with her in an inappropriate manner." *Id*.  Jackson's email noted that it was "the second time that [Durham's] emails have been borderline hostile against FreshRealm and myself." *Id*. at 8. Jackson advised Wait to memorialize the incident for his records as it was "a coaching and development opportunity for [Durham]." *Id*.

In another episode on March 10, 2019, Durham was reported for theft of FreshRealm property by an IT Support Specialist named Charlie Nguyen ("Nguyen") ([Filing No. 23-3 at 4](#)).  Nguyen is of East Asian descent ([Filing No. 23-2 at 10](#)).  While reviewing surveillance tape of the Indianapolis Plant, Nguyen observed footage that appeared to show Durham taking equipment out of the facility and placing it into his car.  *Id.*  In a meeting with Wait and FreshRealm's Vice

President of People, Dawn Batey ("Batey"), following this incident, Durham demonstrated that he was, in fact, not stealing equipment. *Id.* at 11. During the meeting, Durham became frustrated about the false accusation and raised his voice, stated "this is bullshit" and used other "inappropriate language." *Id.* at 10. Durham does not recall "if… or how much more colorful it got," but he thinks that he "made his point." *Id.* While Wait acknowledged that Durham had not stolen any equipment, Durham was given a written warning for insubordination for his vocal and profanity-laced reaction in the meeting. *Id.* at 9.

Around the time of the false accusation of theft, FreshRealm lost its contract to do business with one of its largest grocery store customers, Kroger. (Filing No. 23-3 at 2.) The loss of this business substantially decreased the volume of work at the Indianapolis Plant. *Id.* This decline led FreshRealm to conduct a reduction in force ("RIF") of its employees at the Indianapolis Plant— a reduction from around 100 employees to approximately 20. (Filing No. 23-2 at 6.) Moreover, the Indianapolis Plant moved from running two shifts to one. *Id.* Wait consulted with Durham to "assess which individuals the company should attempt to retain." (Filing No. 23-3 at 3.) Although Durham "was not responsible . . . for the ultimate RIF layoff decisions or informing employees of the company's RIF layoff decisions", Durham held an unapproved meeting with employees at the Indianapolis Plant. *Id.* In this unapproved meeting, Durham made unauthorized and inaccurate comments to employees about the RIF process. *Id.* After discovering this, Wait spoke with Durham and "discussed the risk that Durham's indiscretion and lapse of judgment in having RIF-related discussions with employees had caused the company." *Id.* at 3. Wait also discussed "a few occurrences during the last 2–3 weeks" wherein Durham's conduct was "received as disrespectful, aggressive and unprofessional." *Id.* at 8–9. Wait informed Durham that such conduct would not be tolerated. *Id.* at 9.

4

Williams was valuable to the company because of his technology skills—and "he had never given FreshRealm reason for concern with respect to his interactions with his coworkers"—and FreshRealm sought to retain Williams against competition from other employers. (Filing No. 23-3 at 4). On April 5, 2019, FreshRealm offered Williams the opportunity to relocate to its Swedesboro, New Jersey Plant. Williams declined the offer and in June 2019 resigned from his Assistant Plant Manager position and accepted an employment opportunity with another employer. *Id*.

Also in June 2019, Wait sent Durham an email about deficiencies at the Indianapolis Plant following an internal audit and requested that Durham "review and advise." *Id*. at 14. Durham responded with a point-by-point refutation of the audit's findings. *Id*. at 12–14. Following Durham's response, a temporary employee assisting with the internal audit reported to Wait and Batey that "Durham had approached her and engaged her in a rude, unprofessional manner about the audit's findings." (Filing No. 23-1 at 4.)

On July 8, 2019, Durham participated in a "daily Operations Department conference call" (the "July 8 Call"). *Id*. The entire FreshRealm "senior management team" was on this conference call (Filing No. 23-2 at 24). Durham, "EHS Manager, Robert Henry" ("Henry"), and "Replenishment Buyer, Abby Bormann" ("Bormann") were in a conference room together at the Indianapolis Plant for the July 8 Call. (Filing No. 23-1 at 4.) During the call, King, the Vice President of Operations, began to "pepper [Durham] and ask question after question" about issues at the Indianapolis Plant (Filing No. 23-2 at 32). Durham asked King for permission to speak about the issues "offline" with him and not in front "of [an] audience." *Id*. King refused and continued with his questioning. *Id*. at 33. Durham became "more and more aggravated with each question he was asked." (Filing No. 23-1 at 10.) Durham then stood up and, before leaving the call and the room, said "I'm not doing this. I'm done. I'm out." (Filing No. 23-2 at 33.) Durham

described his exit from the conference call and room as "graciously bow[ing] out from the meeting." *Id*. Henry and others present in the room described Durham as standing up and "cussing" while still on the call and as he left the room, they allege he was "yelling and screaming profanities."[1] ([Filing No. 23-1 at 10](#).) After leaving the room, Durham was in the breakroom and Henry heard Durham continue screaming profanities, including yelling, "fuck this place, fuck them". *Id*. at 11. Henry attempted to calm Durham, but Durham refused and continued using profanity to express his frustrations. *Id*. Durham then received a call about his son and began gathering his belongings to leave the Indianapolis Plant ([Filing No. 23-2 at 38](#)).

Durham came across Nguyen, the IT Support Specialist that reported him for theft, as he was leaving the building. *Id*. Durham confronted the apologetic Nguyen, telling him, "I want you to know a lot of this I believe is firmly directed . . . from . . . the fact that I was allegedly accused of theft from you." *Id*. at 37. Durham did not consider himself "hot and heavy" in his interaction with Nguyen. *Id*. However, during the investigation of the incident, Nguyen stated that Durham "cornered him in the server room" and was "cussing and yelling at him and it made him feel threatened and uncomfortable." ([Filing No. 23-1 at 14](#).)

The EHS Manager, Henry, reported the incident to Batey, the FreshRealm Vice President of People, who then initiated an investigation of Durham's conduct on the July 8 Call and his interaction with Nguyen afterwards. *Id*. at 4. Batey informed Durham that he was being placed on "Administrative Leave Pending Investigation." *Id*.

On July 10, 2019, Batey sent Durham a text message "requesting to set up a phone call to receive his statement" for her investigation. *Id*. Durham informed Batey that his attorney would get "in touch or in contact with next steps or any … response". ([Filing No. 23-2 at 35](#).) Batey

---

[1] In his notes concerning the July 8 call, Robert Henry reports that as he walked out of the conference room Durham "was still yelling. I asked him to breath and calm down. He said "fuck calming down. I am not calming down. What do they want?" ([Filing No. 23-1 at 10](#).)

stated that she "did not know the identity of Durham's attorney at that time and Durham did not provide" her with "his attorney's contact information upon request." (Filing No. 23-1 at 5.)  Batey informed Durham that "as an employee on an administrative leave," there would be "no need for [Batey] to speak with his attorney and [Durham's] failure to participate in the investigation would lead to its conclusion without his statement."  *Id*.  Durham declined to provide Batey with any information or statement about his version of the events of July 8, 2019 (Filing No. 23-2 at 35).

Batey interviewed "multiple witnesses as part of the investigation, including [Henry], [Nguyen], and [Bormann]", and each witness interviewed "corroborated that Durham had acted unprofessionally and inappropriately" during the "July 8[] [ ] Call and afterwards." (Filing No. 23-1 at 5.)  Batey concluded her investigation on July 10, 2019, and notified Wait and King that she would be "recommending FreshRealm terminate Durham's employment for his misconduct on July 8, 2019, coupled with his prior performance and behavioral issues."  *Id*.  Wait and King agreed with Batey's recommendation to terminate Durham's employment "absent any new information Durham might provide in his statement."  *Id*.  By July 12, 2019, Batey "still had not received any information from Durham" and sent him a text message "about obtaining his statement" and Durham "responded that his attorney would be reaching out that day." *Id*. at 5–6.

Three days later, on July 15, 2019, attorneys for Durham sent Batey a letter informing her that Durham was alleging discrimination "on the basis of his age and race" and attached a copy of an Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination.  *Id*. at 17. FreshRealm "proceeded with its previous decision to terminate" Durham's employment "effective July 18, 2019," because, according to Batey, FreshRealm had "not received any additional information from Durham or his attorney" about the misconduct allegations against Durham.  *Id*. at 6.

Durham filed a Complaint on December 12, 2019, alleging violations of Title VII, Section 1981, and the ADEA for racial and age discrimination and retaliatory termination (Filing No. 1). FreshRealm moved for summary judgment of all claims (Filing No. 22).

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante,* 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial*."* *Hemsworth*, 476 F.3d at 490 (citation omitted).  "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits

of [the] claim." *Ritchie v. Glidden Co*., 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc*., 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Durham, as the non-moving party and draws all reasonable inferences in his favor. *Griffin v. City of Milwaukee*, 74 F.3d 824, 827 (7th Cir. 1996). However, employment discrimination cases are "extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Greer v. Bd. of Educ. of City of Chicago, Ill*., 267 F.3d 723, 727 (7th Cir. 2001) (citation and quotation marks omitted).

## III.   DISCUSSION

In Counts I, II, and III of his Complaint, Durham asserts that FreshRealm discriminated against him and terminated his employment due to his race and age in violation of Title VII, Section 1981, and the ADEA (Filing No. 1 at 4–5). In Count IV, Durham asserts that he was wrongfully terminated in retaliation for engaging in protected activity, which violates Title VII, Section 1981, and the ADEA. *Id*. at 5. FreshRealm moves for summary judgment, maintaining that each of Durham's claims fails as a matter of law (Filing No. 22). The Court will address each claim in turn.

### A.   Discrimination

#### 1.   Title VII

Title VII commands that it is "unlawful . . . for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1); *see Bostock v. Clayton Cty.,*
*Georgia*, 140 S. Ct. 1731, 1738 (2020).  In 1991, Congress amended Title VII, adding that "an
unlawful employment practice is established when the complaining party demonstrates that race
… was a motivating factor for any employment practice, even though other factors also motivated
the practice." *Boyd v. Illinois State Police*, 384 F.3d 888, 895 (7th Cir. 2004); *see also* 42 U.S.C.
§ 2000e–2(m).

As held by the Seventh Circuit, "*all* discrimination cases present the same basic legal
inquiry: At the summary-judgment stage, the proper question to ask is 'whether the evidence would
permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other
proscribed factor caused the [plaintiff's] discharge or other adverse employment action.'" *Ferrill*
*v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz v. Werner*
*Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (emphasis and alteration in original).

In *Ortiz*, the Seventh Circuit overruled a series of cases that divided evidence in
discrimination claims into "direct" and "indirect" categories and designated different legal
standards to each. *See* 834 F.3d at 765 ("Evidence is evidence. Relevant evidence must be
considered and irrelevant evidence disregarded, but no evidence should be treated differently from
other evidence because it can be labeled 'direct' or 'indirect.'").  When reviewing the facts under
the framework established by *Ortiz*, the evidence "must be considered as a whole, rather than
asking whether any particular piece of evidence proves the case by itself."  *Id*. at 765.

Importantly, *Ortiz* made clear that its holding did not supplant the well-known burden
shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),
sometimes referred to as an "indirect" means of determining discrimination cases. Durham
concedes he has no proof of direct admissions of discrimination by FreshRealm and, thus, invokes
the burden shifting framework of *McDonnell Douglas* (Filing No. 26 at 14).

According to the *McDonnell Douglas* framework, a plaintiff must first show that "(1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment." *Ferrill*, 860 F.3d at 500 (7th Cir. 2017) (citation omitted). If the plaintiff demonstrates these elements, "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action." *Id.* "If the employer does this, then the burden shifts back to the plaintiff to produce evidence establishing a genuine dispute of fact about whether the employer's reason was a pretext for discrimination." *Id.*

In reverse discrimination cases like this, the *McDonnell Douglas* framework is modified. *See Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (7th Cir. 1999) ("[C]ircuits have modified the *prima facie* test and added various substitutes (referred to as 'background circumstances') for the burden imposed on minority or women plaintiffs to show that they are members of a protected class.") (internal citations omitted). To survive summary judgment in a reverse discrimination case under the modified *McDonnell Douglas* framework, Durham must show that (1) "background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand"; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not members of his protected class. *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (internal citations omitted).

FreshRealm proffers several arguments to support its request for summary judgment on Durham's discrimination claims.  FreshRealm asserts that Durham cannot establish a *prima facie* case that FreshRealm discriminated against him based on race because Durham cannot provide

"similarly situated non-white individuals" that received better opportunities and pay (Filing No. 23 at 20). FreshRealm contends that Durham cannot demonstrate background circumstances showing an inference that FreshRealm had reason to discriminate invidiously against whites or "evidence there is something 'fishy' about the facts." *Id.* at 22. FreshRealm also argues that Durham cannot demonstrate that he was "meeting FreshRealm's legitimate performance expectations." *Id.* at 23. Additionally, FreshRealm maintains that even if Durham was able "to establish a *prima facie* case of reverse race discrimination, he fails under the remainder of the burden shifting framework." *Id.* at 27.

Durham responds that he suffered adverse actions such as "failure to promote, lack of opportunities," and the "botched investigation, planned termination, and spreading of rumors". (Filing No. 26 at 17.) He contends the investigation following his reported theft of company equipment was "racially" motivated and that he was meeting the legitimate performance expectations of FreshRealm as evinced by the lack of any formal or informal discipline he received prior to that incident. *Id.* at 18. Durham contends that because he was never informed of the February 2018 email from the Senior HR Manager, Jackson—informing Wait of Durham's "inappropriate manner" in communicating with her and his "borderline hostile" emails (*see* Filing No. 23-1 at 3, 8)—the "court could conclude . . . [FreshRealm] did not seriously consider it a failure to meet performance expectations." (Filing No. 26 at 19.) Durham asserts that the discipline he received after the theft investigation, consisting of the written warning for his profanity-laced outburst after being falsely accused, "was pretext" and "motivated by discriminatory intent." *Id.*

Durham further contends that he has provided evidence that a similarly situated, non-white employee, Williams, received more favorable treatment than him in the form of "better opportunities at training and advancement" even though "Durham had requested opportunities directly." *Id.* at 20. Durham asserts that "fishy circumstances" exist and that the theft allegation

reported by Nguyen was racially motivated, and he was "targeted for discrimination because his appearance fit a certain stereotype about large, tattooed white men" *Id* at 22.

FreshRealm replies that its investigation into allegations of theft against Durham is not an adverse action (Filing No. 27 at 6). FreshRealm asserts Durham's alleged facts supporting "fishy" circumstances related to his reverse discrimination claim are "not actually facts, but his own speculative and conclusory beliefs." *Id*. at 8.  And Durham's opinion of his job performance is irrelevant as to whether he was meeting FreshRealm's legitimate performance expectations. *Id*. at 10. FreshRealm further maintains that reasonable factfinders cannot infer that Williams was similarly situated to Durham. *Id.* at 11. Additionally, Durham's response does not demonstrate that the legitimate, nondiscriminatory explanation FreshRealm posited for Durham's termination was pretext for discrimination. *Id*. at 14.

Based on the Court's analysis under the modified *McDonnell Douglas* framework, and taking the evidence presented as a whole, as established by *Ortiz*, the Court agrees with FreshRealm.

### a.    The *McDonnell Douglas* Analysis

#### i.    Prong 1

The first prong of the modified *McDonnell Douglas* inquiry requires evidence that background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there are fishy facts at hand.  *See* 817 F.3d at 511.  Durham points to the theft report made by Nguyen and Durham's subjective belief that he was "targeted for discrimination because his appearance fit a certain stereotype about large, tattooed white men" as evidence of the required background circumstances or fishy facts to establish the first prong of the modified inquiry (Filing No. 26 at 22). Accepting as true the background circumstances offered by Durham, the necessary inference that FreshRealm had

reason or inclination to discriminate against white people or that there is evidence of something suspicious about the facts at hand does not exists.

As noted by a sister court in this Circuit, "evidence that those running the company are under pressure from affirmative action plans, customers, public opinion, the EEOC, a judicial decree, or corporate superiors imbued with belief in diversity to increase the proportion of [minorities] in the company's workforce[] would satisfy the modified *McDonnell Douglas* standard." *Jones v. City of Springfield, Ill.*, 540 F. Supp. 2d 1023, 1032 (C.D. Ill. 2008), *aff'd*, 554 F.3d 669 (7th Cir. 2009) (quoting *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 822 n. 5 (7th Cir. 2006) (noting background circumstances which might apply in cases involving white decision-makers favoring minorities)) (internal quotations and citation omitted). Durham's superiors and senior management at FreshRealm (Wait, King, and Batey), are all White (*see* Filing No. 23-1 at 6), and Durham presents no evidence to support that they were under pressure of any kind to increase the proportion of minorities at FreshRealm.  Durham does not contest that his actions during and immediately after the July 8 Call were unprofessional (*see* Filing No. 26 at 10), and he does not contest his non-participation in the ensuing investigation conducted by Batey. *Id.* at 11. Durham presents no evidence, aside from his own speculation, that he was targeted for discrimination based on supposed stereotypes about large, tattooed white men. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").

Similarly, Durham's contention that Nguyen (who is neither a supervisor nor the employer) and his report of suspected theft was motivated by "differences" in their race amounting to a necessary background circumstance is not supported by any evidence offered by Durham. The fact that Nguyen is non-white—of East Asian descent—is insufficient by itself to qualify as a background circumstance or evidence of something suspicious. *Id.* at 22; *see Mills*, 171 F.3d at

14

457 ("[A] plaintiff in a reverse discrimination case must show *at least one* of the background circumstances these other courts have alluded to.") (emphasis added).

Thus, Durham fails the first prong of the *prima facie* test under the *McDonnell Douglas* framework for reverse discrimination because has not presented sufficient evidence that background circumstances exist to show an inference that FreshRealm had reason or inclination to discriminate invidiously against whites or that there were suspicious facts involved.

### ii.   <u>Prong 2</u>

Regarding the second prong, Durham fails to demonstrate that he was meeting the legitimate employment expectations of FreshRealm at the time of his termination when he abruptly ended his participation in the July 8 Call with senior management, cursed repeatedly, made his colleague Nguyen feel threatened, and refused to participate in the investigation of his conduct afterwards. *Id*. at 10; *Hague*, 436 F.3d at 824 (determining that warehouse manager in reverse discrimination suit did not meet employer's expectations by repeatedly cursing and yelling at subordinates among other actions).

Durham does not contest that Wait had previously discussed "a few occurrences" with him about Durham's conduct towards coworkers that was "received as disrespectful, aggressive and unprofessional." ([Filing No. 23-3 at 8](#)–9.) Durham does not contest that he was informed by Wait at that time that such conduct would not be tolerated. *Id.* at 9. A legitimate expectation of employee conduct was clearly established, and Durham has not demonstrated that he was meeting FreshRealm's performance expectations during and after the July 8 Call preceding his termination. *See Peele v. Country Mut. Ins. Co*., 288 F.3d 319, 328 (7th Cir. 2002) ("If a plaintiff fails to demonstrate that she was meeting her employer's legitimate employment expectations at the time of her termination, the employer may not be 'put to the burden of stating the reasons for [her] termination.'") (quoting *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997)).

The Court finds no genuine issue of material fact in dispute about Durham's failure to meet FreshRealm's employment expectations, so he cannot move onto the next step of the inquiry requiring FreshRealm to present reasons for his termination. *See Coco*, 128 F.3d at 1180 (holding that plaintiff was obliged to present evidence he satisfied his burden of showing he was meeting employer's legitimate expectations to demonstrate existence of a genuine issue of material fact).

### iii.   Prong 3

While Durham claims that FreshRealm's failure to promote him, alleged lack of opportunities, and the "botched investigation, planned termination, and spreading of rumors" constitute adverse actions satisfying the third prong of the inquiry, the Court disagrees (Filing No. 26 at 17).  Aside from a mere mention in his response, Durham fails to develop an argument that FreshRealm's alleged failure to promote him and his alleged lack of opportunities were adverse actions. *See Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 679 (7th Cir. 2007) ("[U]ndeveloped arguments are waived.").

To support his contention that the alleged "botched investigation, planned termination, and spreading of rumors" (*see* Filing No. 26 at 17) constitute adverse actions, Durham asserts that the investigation into the alleged theft was motivated by his race and age. *Id*. at 18.  However, Durham provides no evidence, beyond his personal belief, demonstrating the investigation into his alleged theft was racially motivated or otherwise motivated by his age. *See Johnson v. Nordstrom, Inc*., 260 F.3d 727, 733 (7th Cir. 2001) (noting that the plaintiff's personal belief carries no weight in summary judgment analysis).

Durham's assertions that the investigation left a "black mark on his reputation" and a reasonable juror "could conclude that, given the investigation was motivated by an employee's invidious beliefs, Defendant's actions in prematurely assuming Durham's guilt was an adverse employment" action "because it subjected [Durham] to a humiliating workplace environment," is

without merit (Filing No. 26 at 18).  Similarly, Durham contends that the circumstances in this case are like the facts in *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009), which he cites in support.  The Court disagrees.

First, Durham provides no evidence (direct or circumstantial) that Nguyen reported the alleged theft incident because of Durham's race or age.  Second, Durham provides no evidence that he was subjected to a humiliating workplace environment or that there was negative impact to his reputation after the investigation into the theft allegation.  Finally, Durham's reliance on *Nagle* is misplaced as the facts in that case involved a job transfer which the Seventh Circuit affirmed did not constitute an adverse employment action, *see id.*, 554 F.3d at 1116 (holding that materially adverse employment actions includes cases where work conditions subject an employee to humiliating, degrading, or otherwise significantly negative alteration of the workplace environment).  The Court finds that the investigation into the theft allegations does not constitute an adverse employment action and there is no genuine issue of material fact in dispute.

It is undeniable, however, that Durham suffered an adverse employment action when he was terminated, establishing the third prong of the modified *McDonnell Douglas* inquiry.  *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) ("[A] termination is undoubtedly an adverse employment action.").

### iv.   **Prong 4**

As for the fourth prong, Durham fails because he has not proffered evidence showing that Williams—who was always paid less than Durham (*see* Filing No. 23-1 at 3) — and who "had never given FreshRealm reason for concern with respect to his interactions with coworkers" (Filing No. 23-3 at 4), was similarly situated to Durham and received better treatment.  In addition, Williams was not employed by FreshRealm at the time of the July 8 Call.  *See Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) ("[W]e have explained that 'similarly situated' means only that members of the

comparison group are comparable to the plaintiff 'in all *material* respects.'") (quoting *Crawford v. Indiana Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006)) (emphasis in original).  While the Seventh Circuit notes that "the similarly situated inquiry is a flexible one," the Court nevertheless requires that the inquiry examine "whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other *prima facie* evidence, would allow a jury to reach an inference of discrimination or retaliation." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Here, Durham has not presented evidence to show that there are sufficient commonalities with his would-be comparator, Williams. Williams was paid a lesser wage for the same role as Durham, Williams never gave FreshRealm a reason to question his communication with his colleagues, and he was not employed by FreshRealm at the time of the July 8 Call, rendering him an unsuitable comparator to Durham.

Viewing the evidence in a light most favorable to Durham, the Court finds that he has not raised a triable issue as to whether his termination was based on his race, has not demonstrated that his race was a motivating factor in his termination, and has failed the *prima facie* test for determining discrimination under the indirect method of proof.  Even after considering whether the totality of the evidence submitted demonstrates discrimination or discriminatory intent, the designated evidence shows that Durham's race played no role in his termination.

Therefore, the Court **grants** FreshRealm summary judgment on Durham's Title VII race discrimination claim.

### 2.      Section 1981

Section 1981 provides equal rights under the law and states that, "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . to

the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981.

Like Title VII discrimination claims, to succeed on a race discrimination claim under Section 1981, plaintiffs may proceed under the direct or indirect (*i.e.*, *McDonnell Douglas*) method. *Dandy v. United Parcel Serv. Inc.*, 388 F.3d 263, 272 (7th Cir. 2004). As discussed above, Durham has proceeded under the indirect method so the Court applies the modified *McDonnell Douglas* test for reverse discrimination claims under Title VII given that these "same principles apply in the context of a [Section] 1981 action." *Hague*, 436 F.3d at 822 (quoting *Bennett v. Roberts*, 295 F.3d 687, 697 (7th Cir. 2002)) ("The same standards governing liability under Title VII apply to § 1981 claims.") (internal citation omitted).

In a Section 1981 claim, "a plaintiff bears the burden of showing that race was a but-for cause of [his] injury. And, while the materials the plaintiff can rely on to show causation may change as a lawsuit progresses from filing to judgment, the burden itself remains constant." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014–15 (2020); *see Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1262–63 (7th Cir. 1990) ("To be actionable, racial prejudice must be a but-for cause."). The heightened standard of proof, established by *Comcast Corp.*, 140 S. Ct. at 1015, for plaintiffs bringing discrimination claims under Section 1981 means that Durham is obliged to plead and demonstrate that but for his race, FreshRealm would not have terminated his employment.

The Court finds that while Durham sufficiently *pleads* the "but-for causation" standard because he succinctly alleges in his Complaint "Defendant took adverse employment actions against Durham when it terminated his employment *because of his race*", (Filing No. 1 at 4 (emphasis added)), he fails to *demonstrate* that his race was the "but-for" cause of his termination

or *raise* a genuine issue of material fact in dispute to allow his race discrimination claim under Section 1981 to go forward.

As discussed above in the Title VII context, Durham fails the first, second, and fourth prongs of the modified *McDonnell Douglas* burden shifting framework to determine racial discrimination. After careful review of the summary judgment record, the Court finds that the collective evidence proffered by Durham, taken as a whole, would not allow a reasonable factfinder to conclude that Durham's race was the "but-for" cause of his termination.

Therefore, the Court **grants** FreshRealm summary judgment on Durham's claim of intentional racial discrimination under Section 1981.

### 3.  ADEA

The ADEA prohibits employers from discriminating against employees who are forty years or older based on their age.  29 U.S.C. §§ 623(a), 631(a); *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 473 (7th Cir. 2008) ("The ADEA seeks to protect those over the age of forty from age discrimination in the workplace.").

Durham notes the "but-for" standard in age discrimination cases wherein the Seventh Circuit has instructed that "[t]o recover under a theory of disparate treatment in the ADEA context, 'it's not enough to show that age was a motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred.'" *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (quoting *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018)).

As with Durham's Title VII and Section 1981 claims, Durham has not presented direct admissions by FreshRealm of age discrimination, so he proceeds with his ADEA claim under the burden shifting analysis of *McDonnell Douglas* (*see* Filing No. 26 at 14).  In so proceeding under the indirect method of proof, the Court still considers "all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of [his] age."

*Carson v. Lake Cty., Indiana*, 865 F.3d 526, 533 (7th Cir. 2017); *see Ortiz*, 834 F.3d at 765 ("Th[e] legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action.")

As the Court has also determined in its analysis of Durham's race discrimination claims, Durham fails to establish a *prima facie* case under the burden shifting framework. In the context of his ADEA claims, while Durham satisfies prongs one and three of the inquiry because he was forty-three at the time of his adverse employment action (termination) (*see* <u>Filing No. 23-2 at 10</u>), he still fails prongs two and four. Durham has not demonstrated he was meeting FreshRealm's legitimate expectations when he was terminated, and he has not identified a similarly situated younger employee who was treated more favorably.

Durham's argument that "the lack of discipline prior to the investigation into theft could allow a reasonable juror to conclude that the alleged performance deficiencies raised after the investigation were colored by it and therefore motivated by discriminatory intent" (*see* <u>Filing No. 26 at 19</u>), is without merit. As noted by FreshRealm, there is no supported evidence in the record that Wait, King, or Batey "ever considered the accusations of theft . . . made against … Durham again in any decision" that was made about Durham's employment after initially discussing it in March 2019 (<u>Filing No. 27 at 11</u>). Durham's attempt to skip the full *prima facie* inquiry of discrimination under *McDonnell Douglas* and proceed directly to an argument that FreshRealm's legitimate, nondiscriminatory reason for his termination is pretextual is improper. Durham must first meet each element of the *prima facie* case before the burden shifts to FreshRealm, and Durham is unable to satisfy each element because he has not provided evidence showing that he was meeting FreshRealm's legitimate employee expectations when he was terminated.

Durham alleges that FreshRealm offered Williams, the younger, Black Assistant Plant Manager, "more opportunities and training because he did not have a similar discipline history."

(Filing No. 26 at 21.) Durham's attempt to frame Williams as a similarly situated younger comparator who received better treatment fails for the same reasons the Court has analyzed in the race discrimination context: Williams and Durham are not meaningfully similarly situated. *See Humphries*, 474 F.3d at 405 ("As to the relevant factors, an employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity."). Moreover, Durham concedes that he "cannot point to any similarly situated employee that had engaged in the same or similar conduct as he was alleged by FreshRealm to have engaged in on the" July 8 Call, dooming his claim that Williams is a viable comparator (Filing No. 26 at 21). Thus, Durham fails to establish a *prima facie* case under the *McDonnell Douglas* framework for his age discrimination claim.

The Court notes that Durham mischaracterizes the applicable standard here by asserting that "given that the *Ortiz* decision instructed courts to look at all the evidence together, *abandoning* the previous strict burden shifting framework," his age discrimination claim "could still survive given that he has also proffered evidence of pretext." *Id*. at 22 (emphasis added). The Court disagrees with the assertion that the Seventh Circuit has abandoned the burden shifting framework. The Seventh Circuit continues to recognize the *McDonnell Douglas* burden shifting framework as a method for presenting evidence. *See Ortiz*, 834 F.3d at 765 ("[A]ll evidence belongs in a single pile and must be evaluated as a whole. That conclusion is consistent with *McDonnell Douglas* and its successors.").

Even in evaluating the evidence presented as a whole and viewing such evidence in a light most favorable to Durham, the Court finds that Durham has not demonstrated that but-for his age, he would not have been terminated. Therefore, the Court **grants** FreshRealm summary judgment on Durham's age discrimination claim under the ADEA.

B.    **Retaliation**

The Court reviews Title VII, Section 1981 and ADEA retaliation claims under the same framework.  As with employment discrimination cases, the Court looks to determine whether the evidence presented would allow a reasonable factfinder to decide that the plaintiff's age or race "caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765.

Employees can prove retaliation claims in two ways: either through the direct method or the indirect method. "The direct method requires the plaintiff to simply present evidence satisfying the elements of the retaliation claim: (1) he engaged in a protected activity, (2) he suffered an adverse action, and (3) a causal connection exists between the activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (citation omitted).  Alternatively, the indirect method of proof in a retaliation claim uses the burden-shifting *McDonnell Douglas* framework.

As the Seventh Circuit has held, the primary question for a retaliation claim should always be, "[d]oes the record contain sufficient evidence to permit a reasonable factfinder to conclude that retaliatory motive caused the discharge?" *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)); *see Ortiz*, 834 F.3d at 765.  The Court has already determined that Durham cannot establish a *prima facie* case under the *McDonnell Douglas* indirect method of proof; however, here, Durham proceeds under the direct method of proof to establish his retaliation claim.

Regarding the causal connection element of the retaliation inquiry, the Seventh Circuit has instructed that "either direct or circumstantial evidence" can be used under the direct method of proof to show that an employer was motivated to terminate an employee because of his protected activity.  *Harper v. C.R. England, Inc.*, 687 F.3d 297, 307 (7th Cir. 2012).  The Seventh Circuit has held that "circumstantial evidence of retaliation may include 'suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and

23

other bits and pieces from which an inference of discriminatory intent might be drawn.'" *Id*. at 307 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

It is undisputed that Durham's submission of a copy of a proposed EEOC Charge of Discrimination to FreshRealm is protected activity. *See Greengrass v. Int'l Monetary Sys. Ltd*., 776 F.3d 481, 485 (7th Cir. 2015) (holding that the plaintiff's EEOC charges was the most obvious form of statutorily protected activity). Likewise, FreshRealm does not dispute that a termination is an adverse employment action.  FreshRealm's argument against Durham's retaliation claim centers on its assertion that Durham has presented "no evidence demonstrating a causal link between his termination and his attorney's communication regarding an EEOC Charge." (Filing No. 23 at 33.)

FreshRealm contends that Batey, Wait, and King decided to terminate Durham for his conduct following the July 8 Call *before* they received the draft EEOC Charge from Durham's attorney. *Id*. The sworn declarations of Batey and Wait, along with a copy of the Investigation Report of the July 8 Call, corroborates FreshRealm's contention that the recommendation and decision to terminate Durham occurred before FreshRealm received the letter from Durham's attorney on July 15, 2019.  *Id*.  FreshRealm argues that Durham has not "set forth any evidence questioning the basis articulated by FreshRealm for its decision to terminate Durham," and he "has posited no evidence of pretext."  *Id*.  Finally, FreshRealm maintains that "leaving aside the timing of Durham's protected activity following the decision to terminate him," Durham cannot "point to any similarly situated individuals who did not engage in protected activity that FreshRealm treated more favorably."  *Id*.  FreshRealm asserts that Williams "is not a proper comparator," and Williams "resigned his employment prior to the time FreshRealm terminated [Durham's] employment." *Id*.

Durham responds that circumstantial evidence shows a causal connection exists between his termination and his "engagement in protected conduct" (Filing No. 26 at 25), and he cites

*Silverman v. Bd of Educ.*, 637 F.3d 729 (7th Cir. 2011), in support.  In *Silverman*, the Court outlined "three broad types of circumstantial evidence" that a plaintiff, using the now-defunct "'convincing mosaic' approach," could use to prove discrimination, *see id.*, 637 F.3d at 734 ("Finally, the third type of circumstantial evidence is evidence that the plaintiff suffered an adverse employment action and that the employer's justification is pretextual."); *see also Ortiz*, 834 F.3d at 766 ("Today we reiterate that 'convincing mosaic' is not a legal test.").  Durham asserts that he can "rely on the same evidence of pretext that he argued to prove his discrimination claim." (Filing No. 26 at 25.)

The evidence of pretext Durham refers to consists of (1) his contention that the nature of the July 8 Call "differs greatly" from FreshRealm's characterization and "this creates a material issue of fact at the core of [FreshRealm's] proffered reason for termination," (2) FreshRealm's alleged "previous failure to actually discipline Durham" for his "tone" which, according to Durham, calls "into question whether or not [FreshRealm] was truly upset with Durham's alleged behavior," and (3) the fact that FreshRealm "never obtained a statement from Durham." *Id.* at 23. Durham also contends that "the timing of [FreshRealm's] decision supports a finding of retaliatory intent. *Id.* at 25.

In reply, FreshRealm argues that Durham "presents no evidence to counteract" its supporting evidence of the timeline of its decision to terminate Durham "other than (arguably) odd timing." (Filing No. 27 at 15.) FreshRealm asserts that alleged "odd timing . . . does not create a triable issue as a matter of law, and summary judgment is appropriate." *Id.*

The Court agrees with FreshRealm: Durham has not provided evidence necessary to demonstrate a causal connection exists between Durham's July 15, 2019 letter that included a draft EEOC Charge, and his termination which was recommended on July 10, 2019, prior to FreshRealm receiving the letter. Durham's evidence of pretext is generally better suited under the burden-

shifting *McDonnell Douglas* indirect method of proof framework; however, it is still insufficient as circumstantial evidence to establish a causal connection between Durham's protected activity and his termination. To show pretext, a plaintiff bears the burden of demonstrating that the employer's "ostensible justification for its decision is unworthy of credence." *Gordon v. United Airlines, Inc*., 246 F.3d 878, 888 (7th Cir. 2001). If the employer has "honestly described the motivation behind its decision," the decision is not pretext. *Roberts v. Separators, Inc*., 172 F.3d 448, 453 (7th Cir. 1999).

Durham has not presented evidence demonstrating that FreshRealm's decision was a lie or not honestly held, which means the termination decision was not based on a pretextual justification. *See Bahl v. Royal Indemnity Company*, 115 F.3d 1283, 1292 (7th Cir.1997) (in pretext analysis, "only issue is whether management honestly held these views, not whether it was mistaken.").

The Court disagrees with Durham's contention that differing characterizations of the July 8 Call create a material issue of fact because Durham has not provided evidence that either disputes the essential facts of the incident or disproves that FreshRealm honestly described its motivation for its termination decision. Durham acknowledges in his response brief that he prematurely ended the call with his superiors while he was being questioned and he does not dispute that he "allegedly cursed after existing the room." (Filing No. 26 at 10.) Durham provides no evidence to counter FreshRealm's Investigative Report about the July 8 Call and acknowledges that Nguyen "testified that he felt threatened by Durham" during their interaction on July 8, 2019. *Id*. The Court finds no genuine issue of material fact in dispute.

Durham's argument that FreshRealm's failure to discipline him before his termination calls into question whether FreshRealm "truly was upset" with Durham's behavior is irrelevant and not evidence of pretext. The Seventh Circuit has "set a high evidentiary bar for pretext" that Durham

does not meet. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 894 (7th Cir. 2016). Durham merely providing his speculative and conclusory belief about FreshRealm's termination decision is not evidence of pretext. *See Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999) (citing *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995)) ("The pretext analysis seeks to uncover the true intent of the defendant, not the belief of the plaintiff.").

Durham's assertion that "a reasonable juror could conclude that [FreshRealm's] failure to follow up with Durham's attorney or further contact Durham evinced a shoddy investigation, calling into question its seriousness," is without merit and is not evidence of pretext (Filing No. 26 at 24). Batey's sworn declaration states that Durham was contacted on July 10, 2019, for his statement and, without providing a statement, Durham informed her that his attorney would be in contact (*see* Filing No. 23-1 at 4). Durham does not dispute that Batey informed him that "as an employee on an administrative leave, there was no need" for Batey to "speak with [Durham's] attorney and [Durham's] failure to participate in the investigation would lead to its conclusion without his statement." *Id.* at 5. Durham does not provide evidence disputing Batey's declaration or his non-participation in the investigation which fatally undermines his claim that FreshRealm's proffered reason for his termination was not the real motivation. *See* S*anchez*, 188 F.3d at 747 ("To conclude that retaliation was the real motive based on this evidence borders on pure speculation, and as we have stated '[s]peculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.'") (quoting *Tyler v. Runyon*, 70 F.3d 458, 469 (7th Cir. 1995)).

The Court also disagree with Durham's contention that the timing of FreshRealm's decision to terminate him supports a finding of retaliatory intent. Suspicious timing alone is not enough to overcome a motion for summary judgment. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). The designated evidence is that FreshRealm management made the decision and

submitted the recommendation to terminate Durham on July 10, 2019, *before* it received Durham's attorney's draft EEOC Charge (Filing No. 23-1 at 5). Durham provides no evidence to disprove FreshRealm's timeline of its decision to terminate him before it received his draft EEOC Charge and instead merely hypothesizes that a reasonable juror could conclude that FreshRealm's stated timing is false. Durham's conjecture without evidence is insufficient to demonstrate there was suspicious timing between Durham's protected activity and his termination. *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 592 (7th Cir. 2020) (holding that suspicious timing alone is rarely enough to survive summary judgment especially when there are non-suspicious explanations for the timing of the termination); *see also Malin v. Hospira, Inc.*, 762 F.3d 552, 562 (7th Cir. 2014) (noting that there could not be a causal connection in a retaliation claim if an employer's ostensible adverse employment action came before an employee's protected activity).

Durham has not established a causal connection between his protected activity and his termination to prevail on his retaliation claim. The record does not contain sufficient evidence to permit a reasonable factfinder to conclude that retaliatory motive caused Durham's termination. Accordingly, summary judgment is granted on Durham's Title VII and ADEA retaliation claims.

## IV.     CONCLUSION

For the reasons discussed above, the Court **GRANTS** FreshRealm's Motion for Summary Judgment (Filing No. 22).  Durham's claims are **dismissed with prejudice**.  Final Judgment will be entered in a separate order.

**SO ORDERED.**

Date:  7/22/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

28

DISTRIBUTION:

John H. Haskin
JOHN H. HASKIN & ASSOCIATES, LLC
jhaskin@jhaskinlaw.com

Keenan D. Wilson
JOHN H. HASKIN & ASSOCIATES, LLC
kwilson@jhaskinlaw.com

Zachary A. Ahonen
JACKSON LEWIS PC (Indianapolis)
zachary.ahonen@jacksonlewis.com

Michael W. Padgett
JACKSON LEWIS PC (Indianapolis)
michael.padgett@jacksonlewis.com